No. 50,787

STATE OF KANSAS, *Appellee,* v. ROBERT W. PRINCE, *Appellant.*

(605 P.2d 563)

Opinion filed January 19, 1980.

*Charles A. O'Hara,* of Warner, Bailey, O'Hara, Busch & O'Hara, of Wichita, argued the cause and was on the brief for the appellant.

*James Turner,* assistant district attorney, argued the cause and *Robert T. Stephan,* attorney general, *Vern Miller,* district attorney, and *Marvin R. Cook,* assistant district attorney, were on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: This is a direct appeal by Robert W. Prince from a jury conviction on three counts of aggravated robbery, (K.S.A. 21-3427) and two counts of kidnapping (K.S.A. 21-3420) arising out of a series of three robberies of Church's Fried Chicken in Wichita. We affirm.

The pertinent facts are that on August 27, 1978, at 9:00 p.m., a black male entered Church's Fried Chicken store at 1305 N. Hillside in Wichita. He was wearing a ski mask exposing his eyes, nose and mouth. After forcing the customers away from the serving window, the robber pulled a gun, jumped over the counter, and ordered Louis Coleman, the manager, and other employees to the back of the store next to the offices. Coleman, following orders, opened the safe and gave the robber the money in five red money bags, marked "Central State Bank and Trust Company," and the money from the cash register. Thereafter, the robber fled the scene.

About a week later, on September 3, 1978, at the same hour, while Coleman and another employee were getting supplies from a storage shed near the store, a man, wearing a bandana over the lower part of his face, approached asking for the time. Coleman recognized the face, voice and hairstyle as that of the person who

had robbed him the week before. The man ordered them to enter the store from the rear and get the money from the safe. Coleman demurred, stating he could not enter the store through the back door since he didn't have the keys, so the three went around and entered from the front. The robber brandished his gun, ordered everyone to go into the office and face the wall, and Coleman delivered the store's money contained in the same type bags as were taken in the first robbery. During the course of the robbery, Jeannie Webb, one of the employees, came out of the restroom and went to the office to investigate the disturbance. The robber ordered her to the front of the store to bring the money from the cash registers. Webb complied and returned. The robber obtained the keys to Coleman's car, took Ms. Webb as a hostage, and left. He released her about five minutes thereafter and she returned to the store unharmed.

Apparently, the robber appreciated the service at Church's because he returned again on the evening of September 17, 1978, while the store was experiencing a power interruption. While employee Chris Allen was locking one of the doors, he saw a man wearing a dark raincoat enter the store and approach one of the serving windows. Upon being advised the window was closed, the man turned to Allen, stuck what felt like a gun in Allen's back, and told him to "shut up and turn around." The two went to the back of the store, where Allen attempted to open the cash registers and the safe but was prevented by the power failure. The robber ordered Allen to flip the power switch which restored the electricity. He then opened the safe and handed over six red money bags in addition to Coleman's cassette tape recorder. There was no doubt in Coleman's mind that the robber was the same man who had robbed the store on the two previous occasions. Unnoticed by the robber, Coleman had slipped out and called the police at 7:39 p.m. At 8:00 p.m., while searching the general area for the suspect, Officers Almon and Mouser observed a car matching the general description of the robber's car, a black over green 1969 Ford LTD. It was parked in a driveway at 1552 North Estelle with the dome light on and two men in it. The driver was identified as Robert W. Prince. When Prince stepped out of the car, Almon noticed a bulge in his right pants pocket which was found to be a large roll of currency. Because Prince fit the general description of the man who had robbed Church's Fried Chicken,

he was returned to the store where he was identified as the robber. The *Miranda* warning was given and Prince was returned to his car. The officers requested to search the vehicle. The search produced a small cassette tape recorder and a red money bag with the name, "Central State Bank"—or "Central Bank and Trust" written on it. A pistol was removed, examined and placed on the seat. A laboratory investigator, Patric Cunningham, was called to the scene. He photographed the car and the collected evidence.

The cassette tape recorder was later identified by Louis Coleman as the one taken from him. The defendant and his companion were taken to the police station to be interviewed. All other property, including the roll of bills, was taken from Prince, inventoried and placed in the safe.

Defendant was tried, convicted and sentenced to five concurrent terms of not less than five years nor more than life.

Defendant first contends the trial court erred in failing to instruct on lesser included offenses. He believes he was entitled to the instruction because two theories of the case were presented with evidence that would justify a jury conviction of a lesser offense. One theory is that his alibi, if believed, would justify a conviction of possession of stolen property. He also contends that because the gun used was an unloaded, inoperable BB gun, it could not be defined as a dangerous weapon pursuant to K.S.A. 21-3427. Thus, he argues, he was entitled to an instruction on simple robbery. K.S.A. 21-3426.

K.S.A. 21-3107(3) states:

"In cases where the crime charged may include some lesser crime it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced, even though such instructions have not been requested or have been objected to."

The court is required to instruct on a lesser included crime only when there is evidence under which a defendant might have reasonably been convicted of the lesser crime. *State v. Taylor,* 225 Kan. 788, 793, 594 P.2d 211 (1979). The test for the giving of a lesser included instruction is not whether any theory arises under which a person could be found guilty or innocent, but whether there is sufficient evidence to support the giving of an instruction on the lesser charge. Prince's defense was alibi and the employees testified they saw the robber use a gun. Therefore, the jury had to

find him guilty of aggravated robbery or nothing at all. He was not charged with possession of stolen property and that crime is not a lesser included offense of aggravated robbery.

Alternatively, defendant argues that if he were at the scene, the gun was not loaded and had a missing mechanism making it incapable of firing. The fact the gun was not loaded does not warrant an instruction on simple robbery.

"One can be convicted of aggravated robbery by means of a dangerous weapon or deadly weapon, notwithstanding the fact that the gun allegedly used was unloaded." *State v. Mitchell,* 220 Kan. 700, Syl. ¶ 5, 556 P.2d 874 (1976); *State v. Deutscher,* 225 Kan. 265, 268, 589 P.2d 620 (1979).

May a gun, incapable of firing, be a dangerous weapon under our statute? Authorities are split on the test to determine a dangerous weapon, objective or subjective. We adopted the subjective test in *State v. Robertson,* 225 Kan. 572, 592 P.2d 460 (1979), and reaffirmed it in *State v. Davis,* 227 Kan. 174, 605 P.2d 572 (1980), holding a starter's pistol is a dangerous weapon. See also 81 A.L.R.3d 1006. In the instant case there is no question the BB pistol used was unloaded. We hold this weapon, though unloaded and therefore incapable of firing a projectile, is a dangerous weapon pursuant to K.S.A. 21-3427. The pistol is heavy and could easily have been used as a bludgeon against the victims, rendering serious injury or even death. There is nothing in the record to suggest the robberies were committed in any other fashion than urged by the State. The giving of an instruction on the lesser included offense of simple robbery was not warranted and the trial court did not err.

Defendant next complains that his *Jackson v. Denno* hearing was inadequate because it was concerned only with the *Miranda* warning. The crucial facts adduced at the *Denno* hearing show Officer Pate questioned Prince on September 18, 1978, in an interview room on the third floor of the county courthouse. Only defendant and the officer were present. The interview lasted from 3:30 p.m. until about 4:45 p.m. Pate identified himself as a detective, then apprised Prince of his constitutional rights according to the *Miranda* warning. He produced the standard form used by the police department containing a printed reproduction of the *Miranda* warnings. The officer began by showing the form to the defendant and putting an "X" by the first section stating an accused has the right to remain silent. He read the statement to

Prince and asked him if he understood it. Prince replied in the affirmative. Officer Pate then circled the "X" to show the defendant acknowledged he understood the statement. Thereafter, the officer went through the entire form, reading each warning to the defendant and noting whether he understood his rights. The testimony shows the defendant told Pate he understood his rights and so indicated on the form. The officer then testified he asked Prince if, having his rights in mind, he wanted to talk to him now. Prince indicated he did. The officer then marked the slot on the form indicating the defendant was willing to talk to him. The officer then stated: "I then handed him my pen, placed an 'X' at the signature line indicating to him again that if he understood what his rights were and he was willing to talk to me, I needed his signature on that line." Defendant signed the line and initialed the two "X's" indicating he understood his rights and he was willing to talk to the officer. The form was completed a few minutes after they had started. The officer placed the sentence, "no need for an attorney," his initials, the time of completion, 3:34 p.m., and the date at the top of the form. The State offered the signed form, marked Exhibit No. 8, into evidence. It was admitted without objection.

After defendant's attorney had cross-examined Pate, the hearing ended. Defendant contended the hearing should have gone further and included proof by the State that appellant's subsequent statement was freely and voluntarily given. The State argued that neither *Miranda* nor *Jackson v. Denno* required a showing of that kind and argued all that need be shown is that appellant was advised of his rights and his statement was freely and voluntarily made.

At trial, Pate was called to testify and again related the procedure in regard to the *Miranda* warning given defendant. Exhibit No. 8 was again admitted without objection. The officer continued:

"Q: After exhibit 8 was fully executed and completed in the manner you've described, did you then have a conversation with Mr. Prince?

"A: Yes, we had a conversation.

"Q: Would you describe the conversation? Tell us what was said as near as you can recall the specific words used and who said what, you or him.

. . . .

"A: At 1534 hours when I completed the form I then asked Mr. Prince if he cared to talk to me concerning the robberies. He indicated no, that he

didn't have anything to talk about. He stated apparently you have something on me. I indicated to him that I did have something on him, and in fact I had evidence that could link him to three strong arm robberies. I then began telling him pieces of each robbery—."

At this point defendant objected on the ground he had previously said he didn't want to talk with the officer. The trial court agreed, but permitted the officer to testify as to defendant's statements. Officer Pate went on:

"Mr. Prince then stated to me when you dance I guess you have to pay the price.
"Q: Then what occurred?
"A: I indicated to him that that was quite true; that when you play a game of robbery you're bound to get caught and when you do you leave enough evidence behind to link you to the robbery. I then stated to him that I had no intentions of telling him my entire case against him or the cases against him and that—."

At this point defense counsel objected on the grounds the entire conversation was involuntary and should not be before the jury, and moved for a mistrial. The motion was overruled but Officer Pate's testimony was later stricken and the jury was admonished to disregard it.

Should the trial court have required further questioning of Officer Pate about the voluntariness of the defendant's statement at the *Jackson v. Denno* hearing? A *Jackson v. Denno* hearing must be "fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession . . . ." *Jackson v. Denno,* 378 U.S. 368, 391, 12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205 (1964).

The purpose of this type of hearing is to determine the voluntariness of a statement or confession. The determination must include more than a showing a defendant received and understood his *Miranda* rights. The trial court should have required further probing into the circumstances surrounding the statements given by defendant, once it was known he had demurred, even temporarily. The State has the burden of establishing the accused's statements were voluntary. *State v. Law,* 214 Kan. 643, 651, 522 P.2d 320 (1974).

On appeal, in determining whether the trial court should have accepted more evidence at the *Denno* hearing regarding defendant's statement against interest, we stated in *State v. White & Stewart,* 225 Kan. 87, 92, 587 P.2d 1259 (1978):

> "The determination of whether a statement is freely and voluntarily given must be based upon a consideration of the totality of the circumstances. Where there is a genuine conflict in the evidence, an appellate court must place great reliance upon the findings of the trial court. If the trial court's findings are based upon competent evidence, they will not be disturbed on appeal."

See also *State v. Young,* 220 Kan. 541, 552 P.2d 905 (1976); *State v. Ralls,* 216 Kan. 692, 533 P.2d 1294 (1975); *State v. Harden,* 206 Kan. 365, 480 P.2d 53 (1971).

"Factors generally considered as bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. Generally if the accused was not deprived of his free choice to admit, deny or refuse to answer, the statement may be considered voluntary." *State v. Creekmore,* 208 Kan. 933, 934, 495 P.2d 96 (1972).

*State v. Watkins,* 219 Kan. 81, 547 P.2d 810 (1976).

Defendant offered no evidence to show the statement was coerced and produced only one witness to explain the money in the red bag and the cassette player were won gambling. No further evidence was offered concerning the police interrogation and defendant did not testify.

The officer testified the interrogation was not long and it appears, from the evidence, it was fairly conducted. Defendant signed the form stating he would talk and then orally stated he had nothing to say. He then made a voluntary statement to the effect that the officer "had something on him."

Looking at the entire record, we find the trial court should have required further inquiry at the suppression hearing when it became apparent the accused made subsequent statements. See generally *State v. Warden,* 224 Kan. 705, 585 P.2d 1038 (1978). We find, however, that the statements were freely and voluntarily given and were not the product of compulsion. The statements should have been admitted. Any error on the part of the trial court is, therefore, harmless.

Defendant next contends the trial court erred in allowing the State to endorse a new witness the day of trial, while at the same time denying defense counsel's request to endorse an alibi witness.

As the trial began, defendant moved for leave to file notice of

alibi out of time and to endorse an alibi witness. In support of his request, defendant argued he hadn't known the name of the witness until the Monday before the Thursday trial and, therefore, could not have endorsed her earlier. He further argued if the State were permitted late endorsement of a witness he, in turn, should be allowed a late endorsement. The trial court denied defendant's motion on the grounds he had failed to file notice of alibi and granted the State's motion, permitting it to endorse Detective Patric Cunningham as a witness.

Cunningham is a laboratory officer whose testimony was needed to connect one link in the chain of evidence of property found in the defendant's vehicle at the time of arrest. After his name was added to the list of State's witnesses, defendant was given an opportunity to interview him before he testified. K.S.A. 1979 Supp. 22-3201(6) states:

"The prosecuting attorney shall endorse the names of all witnesses known to said attorney upon the complaint, information and indictment at the time of filing the same. Said attorney may endorse thereon the names of other witnesses as may afterward become known to said attorney, at such times as the court may by rule or otherwise prescribe."

It is well established the endorsement of additional witnesses during the course of trial is within the sound discretion of the trial court. That discretion is abused only where the rights of the defendant were unfairly prejudiced by the endorsement. *State v. Taylor,* 217 Kan. 706, Syl. ¶ 6, 538 P.2d 1375 (1975); *State v. Williams & Reynolds,* 217 Kan. 400, 536 P.2d 1395 (1975); *State v. Smith,* 215 Kan. 34, 523 P.2d 691 (1974); *State v. Stafford,* 213 Kan., 152, 515 P.2d 769 (1973). The trial court's ruling with respect to additional witnesses will not be disturbed in the absence of a showing the rights of the defendant were unfairly prejudiced by the late endorsement. There was no such showing in this case.

With respect to defendant's contention that he should be afforded the same right to endorse late witnesses as that given the State we find that is not the real issue here. Defendant wants to use the defense of alibi without having given the seven day statutory notice. K.S.A. 1979 Supp. 22-3218(2) states:

"On due application, and for good cause shown, the court may permit defendant to endorse additional names of witnesses on such notice, using the discretion with respect thereto applicable to allowing the prosecuting attorney to endorse names of additional witnesses on an information. The notice shall be served on

the prosecuting attorney at least seven days before the commencement of the trial, and a copy thereof, with proof of such service, filed with the clerk of the court. For good cause shown the court may permit notice at a later date."

Here the request was to endorse an alibi witness the date of the trial. Defendant must first obtain the trial court's permission to serve notice of alibi out of time by showing good cause. Defendant failed to show good cause. The point is without merit.

Defendant's next issue concerns the trial court's exclusion of a statement allegedly made by one inmate to another while in jail. The declarant is alleged to have stated he, and not the defendant, committed the robberies at Church's Fried Chicken. Defendant contends the testimony should have been admitted under authority of K.S.A. 60-460($d$) and ($j$). Defendant did not argue K.S.A. 60-460($d$) at trial or at the hearing on the motion for a new trial. It is therefore not before us. We will consider only K.S.A. 60-460($j$), which states:

"Subject to the limitations of exception ($f$), a statement which the judge finds was at the time of assertion so far contrary to the declarant's pecuniary or proprietory interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by him or her against another or created such risk of making him or her an object of hatred, ridicule or social disapproval in the community that a reasonable man in the declarant's position would not have made the statement unless he or she believed it to be true."

Defendant preserved the evidence he desired by proffer. It is to the effect that one Max Potts, while in jail, heard one David Turntine, another inmate, say he had robbed Church's Fried Chicken on September 17, 1978, and had "knocked over" Church's many times during the summer and fall of 1978. Defendant stated Potts would so testify. Turntine was represented by attorney Warner Eisenbise who advised the court he would not permit his client to testify. This rendered Turntine unavailable for cross-examination. The court excluded the testimony on that theory, making no mention of K.S.A. 60-460($j$), which defendant urges as his basis for admissibility.

It is clear the alleged statement of David Turntine, if reported to authorities, might subject him to criminal liability. But does it meet the test of "so far contrary to the declarant's penal interest that a reasonable man in the declarant's position would not have made the statement unless he or she believed it to be true?" *State v. Quick,* 226 Kan. 308, 317, 597 P.2d 1108 (1979). We think not. An incriminating conversation between two prisoners sitting in a

cell, without sufficient evidence they expected the conversation to be reported does not place the declarant in the position of possible criminal liability so as to make the statement a declaration against interest. As we stated in *Quick,* at 318, "This is not a case where an inmate in a penal institution comes forward to take the entire blame for a crime, or where accomplices are involved."

The test of admissibility under K.S.A. 60-460(*j*) was correctly stated in *Thompson v. Norman,* 198 Kan. 436, 424 P.2d 593 (1967). This court stated the statute requires, as a "preliminary measure of trustworthiness" the trial judge make a finding, prior to admitting a declaration against interest, that

"the character of the declaration was of such nature a reasonable man would not make it unless he believed it to be true. Probability of veracity is the safeguard sought; the reasonable man test is the criterion to be used. The judge may in a particular case be faced with a difficult decision where caution should be exercised; in making it he necessarily must be vested with a wide discretion.

. . . .

"In determining admissibility he may consider the nature and character of the statement, the person to whom it was made, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which it was made.

"The burden was upon the defendant to satisfy the foundational requirements prior to admission of the declaration. Whether these requirements were satisfied is a matter committed to the discretion of the trial judge." *Thompson v. Norman,* 198 Kan. at 443.

The rule that such admissions are a matter of judicial discretion was affirmed in *State v. Quick,* 226 Kan. 308.

It is clear defendant did not meet his burden of laying a proper foundation for the admission of this evidence. The evidence before the trial court showed only that Max Potts and David Turntine were in the holding cell of the jail and Turntine allegedly told Potts he committed the robberies at Church's Fried Chicken. There is no showing of trustworthiness or indicia of reliability. We hold there was insufficient evidence for the trial judge to find the probability of veracity needed for admission of the declaration. The testimony was properly excluded. The fact it was excluded under the wrong theory is harmless error.

Appellant's issue is without merit. The judgment of the trial court is affirmed.