IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,223

STATE OF KANSAS,
*Appellee*,

v.

TABITHA CARTER,
*Appellant*.

SYLLABUS BY THE COURT

1.

A district judge's written journal entry showing that a defendant is a violent offender subject to the Kansas Offender Registration Act because he or she used a deadly weapon in the commission of a person felony is an adequate finding under the Act.

2.

A "deadly weapon," as that phrase is used in K.S.A. 2019 Supp. 22-4902(e)(2), means any firearm or other device, instrument, material, or substance that, from the manner in which it is used or is intended to be used, is calculated or likely to produce death. Substantial competent evidence supported the district judge's finding in this case that a Taser used by the aggravated robbery defendant was a deadly weapon.

3.

A defendant who displays a weapon to the victim of an aggravated robbery after obtaining the money in a store safe, but before leaving the store, brandishes the weapon and thus "uses" it in the commission of the robbery, as required by K.S.A. 2019 Supp. 22-4902(e)(2).

1

4.

A district judge's finding that a defendant used a deadly weapon in the commission of a person felony does not violate the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

Review of the judgment of the Court of Appeals in 55 Kan. App. 2d 511, 419 P.3d 55 (2018). Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed March 6, 2020. Judgment of the Court of Appeals reversing the district court on the issue subject to review is reversed. Judgment of the district court is affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

PER CURIAM:  Tabitha Carter robbed a Dollar General using a Taser. A jury convicted her of aggravated robbery. The district court judge found that Carter used a deadly weapon to commit a person felony and ordered her to register as a violent offender under the Kansas Offender Registration Act (KORA), K.S.A. 2019 Supp. 22-4902(e)(2). Carter appeals, arguing that the registration requirement was procedurally unsound and not supported by the evidence. We reject these arguments and affirm Carter's registration requirement.

FACTUAL AND PROCEDURAL BACKGROUND

An individual wearing a clown mask entered a Wichita Dollar General in May 2015 and demanded the employees, Celia Reyes and Kaylan Sanders, hand over cash from the store's safe. While in the store, the robber displayed a Taser. The robber made away with over $3,000.

The State charged Carter, a former Dollar General employee, with aggravated robbery in violation of K.S.A. 2011 Supp. 21-5420(b)(1). The State alleged that Carter robbed Kaylan Sanders "by force or threat of bodily harm . . . while [Carter] was armed with a dangerous weapon, to-wit: stun gun or Taser." The case proceeded to a jury trial, in which the State's theory was that Reyes was Carter's accomplice while Sanders was not.

At trial, Reyes denied that she was involved in the planning or execution of the crime and denied that Carter was the robber. Reyes testified that after the robber entered the store and was walking towards the safe, she noticed the robber "had something in his hands, but I wasn't sure what it was at the time." She said she was fearful the robber would hurt her and Sanders if they did not give the robber the money. She said, "[E]specially after we did give him the money because he—I believe it was a Taser— because, you know, at first I didn't know what it was. But once he got up close, I believe it was a Taser in a black box kind of." Later, she said that when the robber first came into the store, she "saw an object in his hand, and so [her] first thought was, is it a gun? And my second thought was, I'm really not trying to get shot." She agreed that she was "certain that the robber had a weapon" and that the robber showed it to her.

Sanders testified that she did not see the Taser until after she and Reyes had handed over the money from the store's safe. Once she and Reyes put the money in the robber's bag, she said, "[the robber] pulled out a Taser. And then [Reyes], she was like no, please. And then the robber just ran out." Sanders believed that the robber was going to tase her. She also testified that the robber pulled the Taser out "almost as if they were pulling it out to show us that they have it."

3

After the jury convicted Carter of aggravated robbery, the district judge imposed a downward departure sentence of 36 months in prison. The district judge then asked, "Is there anything further we need on the record?" The State replied:

> "[STATE]: Your Honor, I believe there would be a duty to register.

> "THE COURT: Is there in this case? All right.

> "[STATE]: With the finding of the dangerous weapon.

> "THE COURT: Well, I do find that there was a *dangerous weapon involved.* I did not prepare—but I will have to prepare the Notice of Duty to Register.

> "In that regard, Ms. Carter, there is a duty to register as a—under the Kansas Offender Registration Act." (Emphasis added.)

The district judge checked a box on Carter's journal entry of sentencing form stating: "Offender committed the current crime with a deadly weapon as determined by the court." The journal entry also set out that the reason for Carter's registration requirement was: "Any conviction of a person felony with court finding on the record that such felony was committed with a deadly weapon—K.S.A. 2012 Supp. 22-4902(e)(2)." Nothing in the record shows Carter objected to the oral pronouncement or the journal entry's checked box. Carter's defense counsel signed off on the journal entry.

Carter appealed her conviction and the district judge's order that she register under KORA. A panel of our Court of Appeals affirmed Carter's conviction but held that she was not required to register under KORA because, the panel concluded, Carter did not use a deadly weapon during the robbery. *State v. Carter*, 55 Kan. App. 2d 511, 519, 419 P.3d 55 (2018).

4

Both parties petitioned for review. This court granted only the State's petition and ordered the parties to address whether, given this court's holding in *State v. Thomas*, 307 Kan. 733, 750, 415 P.3d 430 (2018), the Court of Appeals had jurisdiction to address the registration requirement at all.

DISCUSSION

As an initial matter, we agree with the parties that we have appellate jurisdiction over the registration issue under K.S.A. 2019 Supp. 22-3602(a). See *State v. Marinelli*, 307 Kan. 768, 786, 415 P.3d 405 (2018) (defendant may appeal imposition of registration requirement as "judgment . . . decision . . . or intermediate order made in the progress of the case" under K.S.A. 2018 Supp. 22-3602[a]); *Thomas*, 307 Kan. at 750.

KORA requires individuals convicted of certain crimes to register with the State. One category of individuals required to register are "violent offenders." KORA provides multiple ways in which a person may qualify as a "violent offender" and thus be subject to the Act's registration requirement. The relevant section here is K.S.A. 2019 Supp. 22-4902(e)(2), which defines a violent offender as a person who "on or after July 1, 2006, is convicted of any person felony and the court makes a finding on the record that a *deadly weapon was used in the commission of* such person felony." (Emphasis added.)

Carter attacks her registration requirement in three ways. First, she argues that she was not required to register because the district judge found only that a *dangerous* weapon was involved in her crime, not that she used a *deadly* weapon in the commission of the crime, which was the finding required by the applicable statute. Second, she argues there was no evidence in the record to support a finding that she *used* a *deadly weapon*. Third, she argues that the district judge's fact-finding violated *Apprendi v. New Jersey*,

5

530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). We address each argument in turn.

*Necessity of a Finding on the Record*

Recent decisions of this court have made it clear that a district judge must make a finding on the record before a KORA obligation to register as a violent offender arises. See *Marinelli*, 307 Kan. at 734; *Thomas*, 307 Kan. at 748-49.

In *Thomas*, decided the same day as *Marinelli*, a jury convicted Sheena Thomas of aggravated battery with a deadly weapon for attacking another woman with a stiletto heel. The district judge did not inform Thomas of a KORA registration requirement at the time of her conviction. At sentencing, the district judge told Thomas she must register, but at no time did the district judge make a finding on the record that Thomas used a deadly weapon in the commission of the crime. There was no oral pronouncement; nor did such a finding appear in the journal entry of sentencing. The Court of Appeals panel held that the district judge's failure to make the finding meant Thomas could not be required to register, and it vacated "that portion of [her] sentence" and remanded for the district judge to make the necessary finding. 307 Kan. at 746.

A majority of this court decided in *Thomas* that the Court of Appeals remand order was error. That majority, building on earlier decisions holding that an obligation to register under KORA does not qualify as punishment, see, e.g., *State v. Meredith*, 306 Kan. 906, 911, 399 P.3d 859 (2017), ruled that the necessary violent offender finding was not part of Thomas' sentence. Further, the district court lost jurisdiction to make the finding when the case was docketed for appeal; and that jurisdiction could not be resuscitated on remand for a belated finding. 307 Kan. at 749-50.

In this case governed by K.S.A. 2019 Supp. 22-4902(e)(2), the district judge made an oral finding on the record that there "was a dangerous weapon involved" in Carter's crime. This language differed from that required by the statute, but the judge's journal entry included a checked box stating that he found Carter used a *deadly* weapon *in the commission of* her crime. Carter's arguments on appeal entirely disregard the journal entry and do not explain why it should not qualify as an adequate KORA finding on the record.

Although Carter might have asserted that a sentence pronounced from the bench typically controls over a differing journal entry, see *Abasolo v. State*, 284 Kan. 299, Syl. ¶ 3, 160 P.3d 471 (2007), that rule is not applicable here because of the majority holding in *Thomas* that registration is not part of a defendant's sentence.

In the absence of any other argument from Carter to the contrary, we hold that the journal entry included in the record of this case shows the district judge made the necessary finding under K.S.A. 2019 Supp. 22-4902(e)(2). Thus Carter's first challenge to her registration requirement fails.

*Substantial Competent Evidence to Support the District Judge's Finding*

Carter contends that no evidence supports the district judge's finding that she used a deadly weapon in the commission of the robbery. She asks this court to interpret the meaning of "deadly weapon" and "used" in K.S.A. 2019 Supp. 22-4902(e)(2).

To the extent these arguments require us to engage in statutory interpretation, de novo review applies. *State v. Buell*, 307 Kan. 604, 606, 412 P.3d 1004 (2018). Insofar as Carter argues that the district judge's finding was unsupported, we examine the record to determine whether the finding was supported by substantial competent evidence. See

7

*State v. Haskins*, 262 Kan. 728, 731, 942 P.2d 16 (1997) ("Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law.").

Kansas has no statutory definition of "deadly weapon." Instead, appellate courts have adopted common-law meanings of "deadly weapon" that vary depending on the crime at issue. While the definition of "deadly weapon" when used as an element of a crime is well-settled at this point, our Court of Appeals is split on the appropriate definition of "deadly weapon" as used in KORA.

The parties' arguments on the meaning of "deadly weapon" in K.S.A. 2019 Supp. 22-4902(e)(2) frame the issue as one of diametrically opposed objective and subjective tests. The Court of Appeals panel embraced this dichotomy in this case by disagreeing explicitly with an earlier panel's rubric. See *Carter*, 55 Kan. App. 2d at 521-23 (discussing *State v. Franklin*, 44 Kan. App. 2d 156, 160, 234 P.3d 860 [2010]).

The panel in this case applied what it termed "an objective definition of deadly weapon that includes ones calculated or likely to produce either death or serious bodily injury." 55 Kan. App. 2d at 518-19; see also Black's Law Dictionary 1909 (11th ed. 2019) (deadly weapon is "[a]ny firearm or other device, instrument, material, or substance that, from the manner in which it is used or is intended to be used, is calculated or likely to produce death"); cf. Black's Law Dictionary 1908 (11th ed. 2019) (dangerous weapon is "object or device that, because of the way it is used, is capable of causing serious bodily injury").

8

The panel said "that the State presented no evidence at trial that a Taser is a deadly weapon" and that "[t]here's certainly no common knowledge that a Taser is a deadly weapon in the sense that it's likely to cause death." 55 Kan. App. 2d at 519.

The panel therefore concluded that "Carter didn't use a deadly weapon when she committed the robbery." 55 Kan. App. 2d at 519. Accordingly, she could not be required to register as a violent offender under KORA.

The panel forthrightly stated that its objective test contradicted a subjective test employed by the earlier panel in *Franklin*, 44 Kan. App. 2d at 160. *Carter*, 55 Kan. App. 2d at 520-21.

In that case, defendant Wayne Franklin pleaded guilty to committing an aggravated robbery and attempted aggravated robbery using a BB pistol that the victims perceived to be a handgun. The district judge concluded the BB pistol constituted a deadly weapon under KORA and ordered Franklin to register. 44 Kan. App. 2d at 157.

Franklin appealed, arguing that the BB pistol was not a deadly weapon under KORA. He proposed the panel define "deadly weapon" as "an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury," the same definition of "deadly weapon" used under the aggravated battery statute. 44 Kan. App. 2d at 158. The State advocated for use of a "subjective test" from the aggravated robbery statute: "If the robber intends for the victim to believe the item used in the robbery is a dangerous weapon and the victim reasonably believes such object to be a dangerous weapon, then the item is considered a dangerous weapon." 44 Kan. App. 2d at 159. The *Franklin* panel adopted the subjective test, writing it would be "tortured and illogical" to use a subjective standard to determine guilt and a different standard when considering KORA registration. 44 Kan. App. 2d at 160.

9

The *Franklin* panel also noted that it would use the terms "dangerous weapon" and "deadly weapon" interchangeably because *State v. Colbert*, 244 Kan. 422, Syl. ¶ 2, 769 P.2d 1168 (1989), held that the terms could be exchanged for one another in the context of the aggravated robbery statute. *Franklin*, 44 Kan. App. 2d at 158. *Colbert* was a jury instruction case distinct from the KORA controversy before us. 244 Kan. at 425.

In our view, both the Court of Appeals panel in this case and in *Franklin* focused on the wrong law to arrive at their contrary outcomes. As alluded to above, a majority of this court has repeatedly held that KORA is a "nonpunitive civil regulatory scheme" that does not inflict additional punishment on registrants. See, e.g., *Meredith*, 306 Kan. at 911. In short, this makes KORA distinct from our criminal statutes. The definition of "deadly weapon" in a civil regulatory scheme is not tethered to the definitions of "deadly weapon" in separate criminal statutes.

The meaning of "deadly weapon" as it appears in K.S.A. 2019 Supp. 22-4902(e)(2) is not to be found by choosing between theoretical objective and subjective standards. Rather, we follow our usual statutory interpretation practice of giving effect to the plain meaning of clear statutory language. See *State v. Spencer Gifts,* 304 Kan. 755, 761, 374 P.3d 680 (2016).

Black's Law Dictionary defines "deadly weapon" as "[a]ny firearm or other device, instrument, material, or substance that, from the manner in which it is used or is intended to be used, is calculated or likely to produce death." Black's Law Dictionary 1909 (11th ed. 2019). This is the same resource upon which the panel relied for its "objective" test, but we note that this definition actually includes both objective and subjective aspects.

Under this definition, we hold that the district judge had substantial competent evidence to support his finding that Carter employed a deadly weapon in the aggravated robbery of the Dollar General.

Carter's overall argument to the contrary is fairly perfunctory. She cites to the proprietary website of Axon, the company that manufactures Tasers, quoting its promotional statement that Tasers save lives "because lethal force [is] not used." Her more persuasive point is that the State put on no evidence of Tasers' lethal properties. This criticism is understandable, as it is a matter of common sense that the burden would fall to the State to put forth evidence allowing the district judge to conclude Carter used a deadly weapon. But, ultimately, the weight of growing common knowledge of Tasers' danger saves the State from its misstep.

The Supreme Court of Georgia has recently detailed the operation of Tasers, which have two modes, probe and drive-stun:

> "[I]n probe mode, two metal darts shoot out of the front of the TASER and lodge in the target's body. The TASER then emits a series of electrical pulses through wires connected to the darts over a cycle of five seconds that disrupts the target's central nervous system and causes involuntary muscle contractions. In drive-stun mode, two electrodes in the front of the TASER are placed in direct contact with, or extremely close to, the target's skin. This method also uses a series of electrical pulses over a period of five seconds, but it functions by inducing pain rather than involuntary muscle contractions." *Eberhart v. State*, __ Ga. __, 835 S.E.2d 192, 194 n.3 (2019).

Certainly, Tasers are less likely to kill than firearms but "less lethal" is not the same as "not capable of causing death." Incidents from several jurisdictions throughout the country amply demonstrate this truth. See, e.g., *Oliver v. Fiorino*, 586 F.3d 898, 901 (11th Cir. 2009) (facts viewed in light most favorable to plaintiff decedent's estate show

11

police tased decedent "at least eight and as many as eleven or twelve times," causing decedent's death); *Wilson v. City of Lafayette*, 510 Fed. Appx. 775, 776 (10th Cir. 2013) (unpublished opinion) (police officer deployed Taser one time to subdue suspect; suspect became unresponsive, could not be revived; suspect died of cardiac arrhythmia; parties dispute extent to which Taser, preexisting heart condition, extreme exertion contributed to death); *Kapuscinski v. City of Gibraltar*, 2019 WL 1863867, at *1 (E.D. Mich. 2019) (unpublished opinion) ("Two police officers responding to a domestic violence call deployed their Tasers against David Kapuscinski . . . Mr. Kapuscinski died of cardiac arrhythmia shortly thereafter. The incident is an unfortunate reminder that Tasers are less-lethal, not non-lethal, weapons."); *Eberhart*, __ Ga. at __, 835 S.E.2d at 192-97 (affirming conviction for felony murder predicated on aggravated assault after defendant, accomplice tased handcuffed man 14 times); As Death Toll Keeps Rising, U.S. Communities Start Rethinking Taser Use, Reuters, February 4, 2019, https://www.reuters.com/article/us-usa-taser-deaths-insight/as-death-toll-keeps-rising-u-s-communities-start-rethinking-taser-use-idUSKCN1PT0YT (accessed January 3, 2020) (at least 1,081 United States deaths followed use of Tasers; Taser deemed cause, contributing factor in 21 percent of 779 of the deaths).

In addition, particularly in the context of the commission of a crime, there is no reasonable assumption that a perpetrator will use a Taser according to the manufacturer's directions and in such a way that minimizes the risk of death of the target. While Tasers and stun guns are designed so that the user *may* apply nonlethal force, that does not mean they cannot be misused in a lethal way or with lethal intent. The purpose of a baseball bat is to hit line drives and the purpose of a chef's knife is to dice recipe ingredients, but it is obvious that a judicial finding that either is "deadly" when used in the commission of a person felony is supported by substantial competent evidence.

Carter's next argument is that there was no substantial competent evidence she "used" the Taser "in the commission of" the aggravated robbery. She pins her hopes to Sanders' testimony that she saw the Taser only after Carter had already had Sanders and Reyes give her the money from the Dollar General safe. This means, in her estimation, that she did not "actively employ the Taser to change the circumstances of the crime. She did not use it to facilitate commission of the offense."

Carter cites a 2013 Court of Appeals decision, *State v. Dinneen*, 48 Kan. App. 2d 692, 702-03, 297 P.3d 1185 (2013). Charles Dinneen tried to kidnap his ex-girlfriend before leading police on a car chase and refusing to hand over his gun after he got out of the car. Police shot Dinneen in the leg after he raised his gun during the standoff. Dinneen pleaded guilty to attempted kidnapping, criminal threat, and fleeing and eluding. 48 Kan. App. 2d at 695. The district judge found that Dinneen used a deadly weapon when he committed the crime of fleeing and eluding and thus ordered Dinneen to register as a violent offender under KORA. Dinneen appealed this finding.

The Court of Appeals overturned the finding. The panel concluded that the crime of felony fleeing and eluding began when Dinneen refused to stop after police attempted to stop his car and was completed when he got out of his car. The record showed that police knew Dinneen had a gun with him in the car, but "no evidence [was] presented to show Dinneen touched, held, or in any manner manipulated the handgun while he was inside his vehicle." 48 Kan. App. 2d at 698. This meant that Dinneen did not actually use a deadly weapon in the commission of the felony fleeing and eluding.

The *Dinneen* decision itself cites *Bailey v. United States*, 516 U.S. 137, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995), which dealt with a federal statute criminalizing the use or carrying of a firearm while drug trafficking. The Court noted that "use" can be somewhat ambiguous: "Consider the paradoxical statement: 'I use a gun to protect my house, but

13

I've never had to use it.' 'Use' draws meaning from its context." 516 U.S. at 143. Nevertheless, the Court held that the ban on "'use' of a firearm . . . did not reach 'mere possession' of the weapon." *Abbott v. United States*, 562 U.S. 8, 16, 131 S. Ct. 18, 178 L. Ed. 2d 348 (2010). Instead, to convict a defendant of "use" of a firearm, the State must produce "evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Bailey*, 516 U.S. at 143. The Court concluded that "[a]n evidentiary standard for finding 'use' that is satisfied in almost every case by evidence of mere possession does not adhere to the obvious congressional intent to require more than possession." 516 U.S. at 144. The Court wrote:

> "The active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm. We note that this reading compels the conclusion that even an offender's reference to a firearm in his possession could satisfy [the statute]. Thus, a reference to a firearm calculated to bring about a change in the circumstances of the predicate offense is a 'use,' just as the silent but obvious and forceful presence of a gun on a table can be a 'use.'" 516 U.S. at 148.

Even if we treat *Dinneen* and *Bailey* as controlling, and we ignore Reyes' testimony about what she saw of the weapon in favor of Sanders' recollection that Carter displayed the Taser only after the money was handed over, there was substantial competent evidence in the record that Carter "used" the weapon in the commission of the crime of aggravated robbery. By taking the Taser out of her pocket and displaying it to Sanders, Carter brandished the weapon. The threat that action conveyed helped her to complete her crime.

14

*Apprendi*

This leaves us with Carter's appellate challenge to the district judge's deadly weapon finding as a prohibited *Apprendi* fact-finding. A majority of this court has consistently held that district judges' deadly weapon findings under K.S.A. 2019 Supp. 22-4902(e)(2) do not constitute impermissible judicial fact-finding prohibited by *Apprendi*. See *State v. Perez-Medina*, 310 Kan. 525, 539-40, 448 P.3d 446 (2019); *State v. Huey*, 306 Kan. 1005, 1006, 399 P.3d 211 (2017), *cert. denied* 138 S. Ct. 2673 (2018). We do not depart from that holding today.

CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals' decision relieving Carter of her obligation to register under KORA as a violent offender. We affirm the judgment of the district court.

PATRICK D. MCANANY, Senior Judge, assigned.[1]

* * *

ROSEN, J., dissenting: I respectfully dissent from the majority's conclusion that Carter was not erroneously ordered to register under the Kansas Offender Registration

---

[1] **REPORTER'S NOTE:** Senior Judge McAnany was appointed to hear case No. 116,223 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

Act (KORA). To begin with, I disagree with the majority's underlying premise that KORA is not a sentencing statute that increases the punishment for certain convictions. *State v. Petersen-Beard*, 304 Kan. 192, 194, 377 P.3d 1127 (2016), reversed the then short lived majority in *Doe v. Thompson*, 304 Kan. 291, 373 P.3d 750 (2016), and held that Kansas' offender registration requirement does not constitute punishment. I believe *Petersen-Beard* was wrongly decided for all the reasons thoroughly set out by the court in *Doe v. Thompson* and Justice Lee A. Johnson's dissent in *State v. Petersen-Beard*.

Starting from the position that KORA is a sentencing statute, the analysis in this case must ultimately follow a different path. Carter's offense of conviction, aggravated robbery, is not listed as an offense that automatically qualifies a person as a violent offender under KORA. See K.S.A. 2019 Supp. 22-4902(e). Instead, as the majority notes, Carter could only be required to register if (1) she was convicted of a person felony on or after July 1, 2006; and (2) "the court makes a finding on the record that a deadly weapon was used in the commission of such person felony." K.S.A. 2019 Supp. 22-4902(e)(2). The first requirement was fulfilled because Carter was convicted of aggravated robbery, a person felony, in 2012. See K.S.A. 2011 Supp. 21-5420.

As for whether the second requirement is fulfilled, here is where our paths diverge. At the sentencing hearing, the district court complied with the State's request to find that a dangerous weapon was involved in Carter's crime of conviction. But this is not what was required by statute in order to trigger Carter's duty to register. Under K.S.A. 2019 Supp. 22-4902(e)(2), the court had to find Carter *used* a *deadly* weapon in the commission of the crime. As a result, the second requirement was not fulfilled by the court's finding at the sentencing hearing.

The majority sidesteps this problem by noting the district court made such a finding in the journal entry, but this does not fix the problem. Generally, sentencing in a

16

criminal proceeding takes place when the district court pronounces the sentence from the bench. *Abasolo v. State*, 284 Kan. 299, 304, 160 P.3d 471 (2007). The journal entry is merely a record of the sentence imposed, and the district court has no jurisdiction to change the sentence after pronouncement. *State v. Garcia*, 288 Kan. 761, 766, 207 P.3d 251 (2009). While mandatory conditions of a sentence may be an exception to this rule, special conditions, such as the provision of KORA requiring a judicial fact-finding, are not. See *State v. Marinelli*, 307 Kan. 768, 794-95, 415 P.3d 405 (2018) (Rosen, J., concurring). Here, the district court did not find at the sentencing hearing that Carter committed her crime of conviction using a deadly weapon, so the finding in the journal entry is of no effect.

Moreover, the district court's failure to make the necessary finding at the sentencing hearing cannot be resolved by construing the district court's "dangerous weapon" finding as a "deadly weapon" finding for the purposes of KORA. Based on the plain language of the statute, the court must find the weapon was deadly. And, while a deadly weapon is certainly dangerous, a dangerous weapon is not always deadly. Compare American Heritage Dictionary 365 (College Edition, 2d, 1982) (defining "dangerous" as "[1] [i]nvolving or fraught with danger; perilous; [2] [a]ble or apt to do harm"), with American Heritage Dictionary 368 (College Edition, 2d, 1982) (defining "deadly" as "[c]ausing or tending to cause death; lethal"); see also Black's Law Dictionary 1909 (11th ed. 2019) (defining "deadly weapon" as "[a]ny firearm or other device, instrument, material, or substance that, from the manner in which it is used or is intended to be used, is calculated or likely to produce death.").

Even if the district court had properly made a deadly weapon finding at the sentencing hearing, that finding would still have been in error. Under *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the

prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Thus, any finding that Carter used a deadly weapon had to be made by a jury, not a judge.

Finally, even if I were to agree with the majority's position that KORA is a nonpunitive civil regulatory scheme, I question whether substantial competent evidence would support a finding that Carter used a deadly weapon in the commission of her crime of conviction. Use of a deadly weapon is not an element of aggravated robbery. See K.S.A. 2011 Supp. 21-5420. And the State did not produce evidence showing Tasers to be deadly.

The majority resolves this problem by relying on "the weight of growing common knowledge of Tasers' danger," noting several instances in which the use of a Taser resulted in someone's death. Slip op. at 11. But the question here is not whether Tasers can be lethal or whether the public knows they can be lethal under certain circumstances. Instead, the question is whether Tasers are designed to be lethal or that Carter used the Taser in a way that was likely to be lethal. And unlike a baseball bat or a kitchen knife, which were not designed to be weapons at all, the Taser was specifically designed as "a *nonlethal* alternative to the use of deadly force by law-enforcement officers." *State v. Carter*, 55 Kan. App. 2d 511, 519, 419 P.3d 55 (2018). And this design purpose is certainly common knowledge. As a result, I would hold the district court erred in ordering Carter to register under KORA, regardless of whether KORA is punitive or not.

BEIER, J., joins the foregoing dissent.

18